COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-08-403-CV

 

 

IN THE
INTEREST OF B.B. 

AND B.B., CHILDREN                                                                           

 

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

                                                    

                                              ------------

I.  Introduction








Appellant Mother appeals the order terminating
her parental rights to Beth  and Becca.[2]  In four issues,[3]
Mother argues that the evidence is legally and factually insufficient to
support the trial court=s findings under Texas Family
Code section 161.001(1)(D) and (E), section 161.001(2), and section
161.003.  We will affirm.

II.  Factual Background

A.  Mother=s
Background

Mother grew up in a foster home in New Jersey and
completed school through the eleventh grade. 
In her teen years, mother was diagnosed with bipolar disorder and saw a
counselor, but she could not recall exactly when she began taking medication
for the disorder.

Mother now has five children, three of whom were
not living with her at the time of these proceedings:  a grown son, who was raised by his father=s
cousin; a grown daughter, whose upbringing Mother refused to discuss because
the daughter was Aa rape child@; and a
twelve-year-old son, whose whereabouts and paternity were unknown to
Mother.  Mother testified that she talks
to her grown children every day, but she was evasive about where they live.[4]  None of these children are involved in the
current proceeding.








The two children at issue are Mother=s two
youngest children, BethCwho was born January 27, 1994Cand
Becca, who was born April 5, 1995.  B.F.
is the father of both girls, but he had not seen them since Beth was a year old
and Becca was four months old.  Mother
was never legally married to B.F.

At the time of trial, Mother was married to H.G.
but had filed a petition for divorce from him. 
Mother testified that she was not currently in a relationship.

B.     Referrals in New Jersey

1.     According to CPS=s
Records

Melinda Hawkins, a CPS investigator, found out
through her conversation with the girls that there had been prior CPS cases
against Mother in New Jersey involving both the grown children and Beth and
Becca.  The record that Hawkins reviewed
revealed that there had been multiple CPS cases in New Jersey and that they all
involved domestic violence, drug use, or both.

In 1988, Mother dropped off her then
two-month-old daughter at an agency office in New Jersey, but no other
information was available.

In 1990, New Jersey CPS received a referral
involving Mother=s son, who was six months old at
the time.  The father (who is not the
same father of Beth and Becca) pushed Mother, and the baby hit his head on a
wall.  Mother went to a women=s
shelter after that incident.








In 1991, New Jersey CPS received a referral that
Mother was not in a stable condition to take care of the children and that she
was in need of mental health services. 
The file mentioned that this referral occurred after Aan
accident@ but did
not contain information on the type of accident.

In April 2001, New Jersey CPS received a referral
that Mother was living at the Rescue Mission, that she had been out all day and
had failed to return, and that the children were at the shelter.

In September 2001, New Jersey CPS received a
referral that Mother had contacted Rescue Mission because she was locked out of
her house and could not find Beth and Becca. 
The referral stated that Mother had been missing for a few days prior to
that and that the girls were living with a family friend.

In May 2006, New Jersey CPS received a referral
that Beth had lost her keys and was fearful that she was going to get a beating
when she returned home.  The concerns of
domestic violence were not substantiated at that time.








In November 2006, New Jersey CPS received a
referral that the girls had run away due to domestic violence and that they had
been staying with a family friend for a month. 
During the month that the girls were gone, Mother did not call to check
on the girls= welfare, and when the girls
tried to call Mother, she did not answer. 
The girls were thereafter removed from Mother=s
custody;[5]
New Jersey CPS was concerned because the girls had found a crack pipe in the
home and because of Mother=s mental
health situation.

2.     Mother=s Side
of the Story

Mother recalled that there were Aquite a
few unfounded allegations@ of physical abuse by Mother
toward Beth in 2006 in New Jersey. 
Mother described an event when Beth gagged herself at the Atlantic City
Shelter; Mother said that Beth was not trying to kill herself but was merely
trying to get some attention because she was frustrated at the way she was
being treated by the other girls.  Mother
said that Beth got her attention, but Mother did not take Beth to the doctor
because she was not hurt.








Mother testified that her daughters came into
foster care in New Jersey because Athere
was some domestic violence and some drug abuse.@  Mother said that her husband, H.G., was the
person committing the domestic violence, that he hit her with his hand, and
that she asked him to leave, Abut, you
know, just as [with] everything, people change.@[6]  Mother testified that Athere
were quite a few instances where the police were called@ and
that she sought a temporary restraining order against H.G. a couple of times,
but she did not recollect whether she followed through and obtained a permanent
restraining order against him.  Mother
said that her daughters were scared about the violence in the home between
Mother and H.G.  In November 2006, for
her daughters= safety, Mother placed the girls
with a friend until the domestic violence issue could be resolved.

Mother said that she relapsed on cocaine in 2006,
after having been clean for five years, and that her children were removed as a
result of her cocaine use.  Mother blamed
her relapse on poor decisions.  While her
daughters were in foster care in New Jersey, Mother lived in Philadelphia in a
sober house.

Mother=s
services in the New Jersey case included attending counseling and mental health
programs, staying clean, and attending required meetings.  During that time, however, Mother was not
visiting her children because she was living in Pennsylvania and the girls were
living in New Jersey.  Mother worked her
service plan in the New Jersey case, and her daughters were returned to her.








When the girls were returned to Mother, her
understanding was that New Jersey CPS was supposed to contact Texas CPS and
that together, over six months, the two agencies would work with Mother to help
make her transition smooth.  Mother,
however, was not contacted by anyone from Texas CPS when she moved here, so she
attempted to seek services and assistance on her own.

C.     Referrals in Texas

The first referral came in to Texas CPS regarding
the safety and possible neglect of the girls on November 9, 2007, while the
girls were living with Mother at an apartment complex in Arlington.  The girls were found in the apartment complex
at 10:00 p.m., and when law enforcement arrived and questioned the girls, they
said that they lived in the Family Life Shelter in Arlington, that Mother was
no longer there, and that she was not answering her phone.  Hawkins noted the similarity between this
referral and the April 2001 referral in New Jersey.

Three days later on November 12, 2007, the
shelter requested that Mother complete a drug test, but she refused.  Mother was very upset about the
investigation; she took the girls and left the shelter.








Another referral came in on November 28, 2007,
which was very similar to the November 2006 referral in New Jersey, and which
alleged that the girls were at an apartment complex with one of Mother=s
friends who was unable to care for the girls. 
Mother had told her friend that she would be gone for a weekend.  Two days after Mother left, she called the
girls and said that she was coming back to get them, but two weeks had elapsed
with no sign of her.  Beth became sick
and was running out of her bipolar medication,[7]
so the friend could no longer keep the girls.

Hawkins discovered that Beth had only two or
three pills of her bipolar medication left and that she also had a cough.  Hawkins said that because they could not
contact Mother, they did not know how to refill Beth=s
medicine, which had been prescribed by a doctor in New Jersey.[8]

Hawkins testified that when the referral came in
to Texas CPS, the caseworkers were concerned about the situation that the girls
might be in by living in Mother=s
apartment because it did not have adequate furniture and there was no
heat.  There were also domestic violence
concerns, stemming from H.G.=s living
with Mother. 

D.     Removal in Texas

1.     According to CPS=s
Records








The day that Hawkins removed the girlsCNovember
28, 2007Cshe
tried to locate Mother.  The girls told
her that Mother Ahung out@ at a
friend=s house.  When CPS went to the house to look for
Mother, the occupants said that they had not seen her in a couple of
weeks.  Hawkins kept trying to call
Mother=s cell
phone number, but there was no answer. 
Hawkins also called the jails and shelters in Tarrant County but was not
successful in locating Mother.

During the car ride to the foster home, Beth kept
calling Mother=s phone, and it kept saying that
the voice mail was full.  The girls were
upset, but Beth made the comment, AI can=t
believe that she did this again.@  Hawkins thought that the girls seemed used to
Mother=s
behavior.

Hawkins disposed of the case as AReason
To Believe for Neglectful Supervision.@  Hawkins said that CPS was concerned about
Beth almost running out of her medicine but that CPS could not add that to the
removal allegations because at the time, they were not able to talk to Mother
to determine whether this was intentional.  Hawkins testified that after hearing Mother=s
testimony at trial, CPS would have substantiated the medical neglect as well
because Beth needed the medicine and did not have it for whatever reason. 

2.     Mother=s Side
of the Story

Mother said that she and the girls moved to Texas
to get away from what was going on in Pennsylvania and New Jersey.  When they came to Texas, Beth had only a week=s worth
of medication, but she did not run out of her medications while she was in
Mother=s care.








Mother said that she was not in a position to
prevent CPS from taking her daughters into custody when they were removed in
late November 2007.  Mother explained
that she left her daughters with a neighbor so that they could attend the same
school while Mother Awas trying to make some
decisions on what [she] was going to do for their stability.@  Mother left her daughters with her neighbor,
even though she did not know the neighbor that well, because her daughters were
friends with the neighbor=s children.  Mother gave the neighbor a cell phone number
where she could be reached. 

In December, Mother made contact with the
neighbor with whom she had left the girls and learned that the neighbor had
called CPS after two weeks of caring for the girls and that the girls were in
CPS care in Tarrant County.  Mother
thinks that two months elapsed before she made contact with her daughters after
they were taken into CPS=s custody.  Mother said that her cell phone did not work
during the entire time that the girls were taken into CPS=s care,
and there was no alternate number for them to use to contact her.  Mother agreed that by her leaving the girls
and not returning, CPS had grounds to take the girls into custody. 

E.     Mother=s
Service Plan and Compliance Therewith








Katrina White, the ongoing caseworker for Beth
and Becca, received the case in late January 2008 and met with Mother to work
out a new service plan because the initial plan was written before CPS knew
where Mother was living.[9]  Mother=s
service plan included (1) weekly visitation with her daughters and required
Mother (2) to attend individual counseling and to abide by the recommendations
of the counselors, (3) to complete a psychological evaluation, (4) to submit to
random drug testing, (5) to attend parenting classes, (6) to provide a safe,
stable, and appropriate home, (7) to become gainfully employed, and (8) to
continue with MHMR and to follow its recommendations.  White also told Mother that it would be good
for her to attend Narcotics Anonymous (NA) meetings.

1.     Visits








White scheduled visits around when it was
convenient for Mother to attend,[10]
yet during the nine and a half months that the case was pending, Mother made
only twelve visits.  When Mother attended
the visits, she almost always brought lots of clothing for the girls.  White did not have any concern over the
visits on February 14, February 21, March 13, March 18, and March 27. 

Mother missed a visit on April 24 and called
White on April 30 asking to reschedule. 
Mother said that she was no longer living in the apartment but was
living in a women=s shelter after suffering
domestic abuse inflicted by H.G.  White
rescheduled the visit for May 2, but Mother failed to show up.  White did not hear from Mother after the
April 30 call until June 17, and Mother did not visit from March 28 until June
30.  During the time when Mother was in
and out of the picture and then called White, she would say that she did not
want to disappoint the girls, but White did not recall Mother=s asking
how the girls were doing.

White observed the visits because Mother had a
problem with the two case aides and asked that White be the one to supervise
the visits after that.  White testified
that not all the visits had been happy. 
There were a couple of visits when Beth ended up in tears because Mother
was not paying attention to her.








During the visit one week before trial, Mother
was very upset and agitated and confronted White about some things the girls
had said.  White testified that the girls
had taken something out of context that White had told them or had
misunderstood what White had said and conveyed that to their Mother.  White explained to Mother what White had
actually said to the girls.  Later,
Mother started telling the girls things that White did not feel were
appropriate for the visit, and White asked her not to talk about those things
during the visit.  Mother proceeded to
argue with White, and White told her to stop arguing or she would have to end
the visit.  Mother persisted, and White
ended the visit.  During this time, White
Awas a
little concerned@ about being around Mother
during her time of heightened emotion. 








According to Mother, she visited her daughters
every time she could possibly visit; when she missed a visit, it was because
she had moved to a shelter and did not have transportation.  Mother said that her visit the week before
trial went well as between her and the children but that White Adidn=t seem
to like that I . . . upset[] my children with some information that was shared
with them, and she wanted to end the visit.@  Mother explained that White was approximately
thirty or forty minutes late to the visit and that this caused tension.  Mother said that the girls were upset about a
lot of things that were being said to them during transportation to and from
the visits, and they were visibly upset. 
So Mother inquired why Acertain
things were being shared@ with the girls because it was
upsetting them.  Mother guessed that
White did not feel like Mother should be questioning anything and told Mother
that she could stop the visits if Mother wanted to argue.  Mother did not feel like she was arguing but
rather making an inquiry. 

2.     Individual Counseling

Mother attended seven individual counseling
sessions at Positive Influences but stopped going at the end of April because
she moved to a shelter.  Mother therefore
did not successfully complete the individual counseling that was required by
her service plan.  White said that she
thinks Mother still needs counseling. 

3.     Psychological Evaluation

Mother completed a psychological evaluation with
Dr. Mark Matthews but did not receive a copy of it and was not aware of the
recommendations made in conjunction with the psychological evaluation.[11]


4.     Drug Testing and NA








White testified that she told Mother where to go
to take the hair follicle test, explained that CPS would pay for all the
services, and gave her a deadline for taking the test, but that Mother did not
ever submit a hair follicle sample. 
White also asked Mother to complete a urinalysis, but she did not.[12]  Mother did, however, supply White with the
results of a drug test that she had done at MHMR in March 2008.  Mother went for a drug assessment and did not
have a positive drug test, so she was not admitted into the CATS program.  And although White had asked Mother to
provide evidence verifying each NA meeting that she attended with a signature
from someone who facilitates the meeting, Mother offered only a piece of NA
stationery. 

During Mother=s
testimony at trial, she said that she was never asked to submit a urinalysis
and that the hair follicle test was never set up.  Mother admitted that the longest she had gone
without using cocaine is five or six years and that the last time she used
cocaine Awas
earlier this year.@[13]  However, Mother stated that she was now
drug-free.  She had been a member of NA
for ten years, had been through the steps and was back on step one, had a
sponsor, and had attended up to two meetings a day. 

5.     Parenting Classes

Mother completed parenting classes and anger
management classes.

 








6.     Safe, Stable, and Appropriate Home

White said that Mother has had periods of stable
housing and periods of unstable housing throughout the case.  White said that Mother had lived on Liberty
Street, then in a shelter, and at the time of trial was in a two-bedroom
apartment off Arkansas Lane that she began leasing five weeks before trial.[14]  White visited Mother=s
apartment and noted that it had adequate furnishings and was clean.  White testified, however, that it appeared
that Mother was living with H.G. at some point during this case, which
concerned White because the girls had said that H.G. was the reason that Mother
had started doing drugs again and that he had abused Mother both physically and
emotionally.








Mother testified that she lived at four places
during the time that CPS had been involved in this case in Tarrant County:  an apartment in Arlington; a shelter; a
residence on Liberty Street; and, at the time of trial, at an apartment on
Arkansas Lane.[15]  Mother explained her numerous moves by
stating that she moved from the apartments in Arlington because she was trying
to do things on her own for her children but ended up losing her job, time,
money, and the apartment.  Mother said
that she went to a shelter and had to leave because there was no
availability.  Mother spent an extended
period of time living in the house on Liberty Street because her church was
assisting her until she found something more permanent. 

Mother said that during the time that she did not
have stable housing, she was working on it. 
Mother thought the focus on the time frames that she took to get stable
should not lead the trial court to conclude that she is Aa
totally incapable, unstable mother.@ 

7.     Employment

Mother had never provided her caseworker with a
pay stub, proof of employment, or documentation that she is disabled due to her
bipolar disorder.  However, White had
spoken with Ms. Disney, who worked in the MHMR building, and Ms. Disney said
that she was taking care of Mother=s SSI
and disability but did not provide White with any physical documentation.








Mother worked at Motorola for one day while the
case was pending, but other than that, she had not worked due to
disability.  Mother stated that she was
in the process of obtaining Social Security disability income and that Dr.
Patel with MHMR had signed a medical release stating that Mother=s
disability deemed her permanently unable to work, but that she had not heard a
final decision on her ability to receive disability income.  Mother said that if the SSDI was not
approved, she would Ajust work [her] way back towards
gainful employment@ so that she could provide for
herself and her daughters. 

With regard to providing financially for the
girls=
physical needs, Mother said that she would be able to provide food because she
was receiving food stamps, that she would be able to provide clothing because
there are resources in the community that provide clothing, and that she had
already begun the process of getting school supplies for her daughters from the
Arlington Life Shelter.  When asked
whether she had transportation, she said that she did not personally have
transportation but was centrally located and was only ten minutes from school
and the doctors= offices. 

8.     MHMR

White said that other than the one time after the
continuation hearing, Mother had always been very pleasant to her, so White had
never had a reason to believe that Mother was not taking her bipolar
medications.  White, however, admitted
that she did not have any knowledge that Mother was taking her bipolar
medications and expressed concern that Mother was not taking anything for her paranoid
schizophrenia. 








Mother admitted that she had been diagnosed with
bipolar disorder and said that she was taking her medications daily.  Mother was not aware that she had been
diagnosed as paranoid schizophrenic and said that she was not taking any
medication for that diagnosis.  Mother
said that regardless of the diagnosis Dr. Patel gave her, she was taking the
medications he gave her and would follow up with MHMR.  Mother, however, admitted that she missed
four appointments with Dr. Patel because he was in Fort Worth and that there is
no bus route from Arlington. 

9.     Overall

White testified that overall, Mother was
cooperative and appeared to want to work her service plan.  Every time Mother talked to White, she asked
what she had left to do on her service plan and always gave White some way to
get in touch with her.[16]  White, however, had numerous concerns.








White said that there was certainly a concern
that if Mother got the girls back, she would return to H.G. in the future and
expose the girls to more domestic violence. 
White testified that Mother had used cocaine since she moved to Texas,
and the fact that Mother had failed to remain drug-free is a risk to the girls
because Mother=s use of cocaine would impair
her supervision and decision-making abilities. 
Mother had the whole case to obtain housing but failed to do so until
August 1, approximately five weeks before the termination trial; White said
that this concerned her because it was not enough time to show stability.  White also had concerns about returning the
girls to Mother if she was not taking medication for a mental illness because
the medication stabilizes the person=s moods
and actions, and without stable moods, the person would not be able to care for
her children as effectively.

White admitted that she took it upon herself to
transport Mother to the majority of the visits because White wanted to award
Mother all the opportunities possible to make the visits.  White believed that Mother had ample opportunity
to work the service plan but that she had not made any significant changes in
her life to regain custody of her daughters. 
White said that even if Mother had finished counseling, she would not
have done everything on her plan, except obtain a job, because White did not
feel like Mother had proven that she could be stable.  In White=s
opinion, Mother had demonstrated an inability to provide a safe environment for
her daughters throughout the New Jersey case and the Texas case involving
CPS.  White did not believe that Mother
would provide a safe and secure environment for her daughters if the court
returned them to her, nor did White believe that Mother would be able to care
for, nurture, and guide her daughters if CPS ended its involvement in their lives.  White concluded that during the nine and a
half months that the case had been pending, Mother had not shown that she had
established stable housing, stable employment, or emotional stability. 








When asked what changes she had made, Mother said
that she had obtained stable housing, was drug-free, attended and diligently
worked a recovery program, was compliant with her doctor appointments and
medication, and was working on obtaining disability pay.  Mother said that she stayed in touch with her
caseworker to the best of her ability during the entire case and that she
performed to the best of her ability the services that were asked of her. 

F.      The Effects of Mother=s
Behavior on the Girls

1.     According to the CASA Advocate

Myrosh, the CASA advocate, became involved with
the case in February 2008.  Myrosh said
that both girls are in the same grade and had recently completed and passed the
seventh grade prior to the start of trial. 
Myrosh described the girls as confused, hurt, and angry and said that
they have a lot of conflicting emotions. 








When Myrosh first met Beth, she was always
getting in trouble at school and being placed on suspension or detention, she
was not doing well in her schoolwork, and she had a bad attitude.  Two or three months later when Myrosh met
with Beth=s teachers, they commented that
Beth had changed and was getting along with her peers, making friends, doing
her schoolwork, asking for extra credit to raise her grades, and becoming more
involved in what she was supposed to be doing at school.[17]  The teacher noted that peace had come to the
classroom because Beth was no longer acting as the ringleader and perpetuating
a hostile environment in the classroom. 

Becca had also been in detention and had been
suspended at times but had improved.  She
had raised her grades and was treating her sister and other students in the
classroom better. 

Myrosh observed four visits between Mother and
her daughters.  On one visit, Myrosh
observed Beth crying because Becca was picking on her, and Mother encouraged
Beth to toughen up. 

During another visit that Myrosh observed, Mother
felt that there were some racial issues with the case aide and requested that a
new case aide be assigned.  Myrosh had
observed the case aide in the visits and found her to be a very strict
rule-enforcer, which Myrosh thought was appropriate for the visits.  Myrosh, however, thought it was inappropriate
for Mother to be talking about this issue in front of her daughters and asked
if it could be discussed privately, but Mother said that they share everything
and that it was okay for the girls to be there.








When asked whether there were any other times
that she observed Mother talking to the girls about something that she thought
was inappropriate to talk about in front of them, Myrosh said that Mother
discussed this case with her daughters and with the caseworker (while her
daughters were present) and that there was 

this air of keeping
secrets with the girls, talking with or just making like snide remarks or
rolling the eyes if a case aide or the caseworker said something, or just
basically not making the environment to be a -- to be one that is showing total
support of trying to work on the goals. 
Not necessarily work on the goals, but work on keeping peace and just
having things run smooth during the visit. 

 

Myrosh said that there had been a couple of times
when the girls went for a visit and their mother did not show up, as well as
times when the caseworker did not come to the school to pick up the girls
because she knew Mother had not shown up. 
The longest period of time that Mother went without visiting was six
weeks.  Myrosh said that this occurred
during the last couple of months before trial and that Mother had just returned
to visiting during the weeks preceding trial. 








During those times when visits were not taking
place, Beth would call Myrosh and want to know where her mother was because she
had been counting on a visit that day. 
The girls also disclosed to Myrosh their frustration about their mother
not showing up at visits.  Myrosh said
that Beth had told her, AI guess she [Mother] really
doesn=t want
us,@ and
Becca had asked, AIf Mom comes around again, what
state are we going to live in this time?@  Myrosh said that at that point, the girls
were no longer frustrated but were resigned to the fact that Athis is
how it is@ so A[l]et=s move
on.@[18] 

Myrosh noted that when Mother came to the visits,
the girls would be excited but would come back angry.  When Mother took breaks from visiting, the
girls started acting up more at school and were angry with everyone that came
into their path.  For the first couple of
weeks when Mother stopped visiting, the girls voiced their hurt, but then after
they got used to it, they made a complete turnaround and were open, compliant,
and obedient.  When Mother reappeared,
the cycle started over again. 

Myrosh believed the girls had come to the
realization that Mother is never going to be stable.  The girls wanted things to go well for their
mother, but the girls were scared.  Specifically,
Beth was fearful of the abuse that she received from Mother and stepfather,
which involved holding her down and hitting her, and both girls were afraid of
the Agoing in
and out constantly.@ 








Myrosh also visited the girls= foster
home between four and seven times during the case.  In the beginning, Beth ate food out of the
trash because she had no manners, talked rudely about people, and failed to
show respect for other individuals. 
Myrosh said that Beth=s
disrespect was not as strong as it was in the beginning and that her foster dad
had worked with her on her manners. 
Myrosh testified that the foster family had worked with the girls on
their behavior; had provided the girls with boundaries and stability,
sufficient food, and proper clothing; and had taken the girls to counseling
during the time that they had housed them. 

2.     According to the Caseworker

White testified that Becca never seemed to want
to talk about the removal in New Jersey and that Beth would Aget very
convoluted@ when she talked about it, so
White never obtained a good explanation for what happened.  Becca told White that H.G. was the reason
Mother started doing drugs again and that he was the reason the girls would
leave the home because he engaged in domestic violence. 

White testified that both girls were better off
psychologically and emotionally than they were in the beginning.  Their hygiene was much better, they were no
longer eating from the trash, they got along much better with everybody, and
Becca had calmed down and was not lashing out at everybody. 








White said that although the girls seemed more
relaxed and a lot happier when Mother was not visiting, the girls loved their
Mother a lot and had tried to protect her throughout this case.  White did not think that the girls would ever
lose hope that Mother would turn her life around but testified that a continued
hope of Mother being in the picture could adversely affect Beth and Becca. 

White testified that she had been to the foster
parents= home
ten times  and felt that the foster
parents had adequately provided for Beth=s
medical care in terms of her bipolar disorder. 
White said that the girls called their foster home their Ahome,@ that
they got along well with the foster family, and that they really liked being in
the foster home, but the girls had a hard time trusting people and were scared
to make another parental bond with someone else. 

3.     According to the Girls=
Counselor

Lazane Walls testified that she had been
counseling the girls every other week since February 2007 and was still
counseling them at the time of trial. 
When Walls first started counseling the girls, they said that they had
moved to Texas from New Jersey and that they had lived with relatives (without
Mother) in North or South Carolina before that. 
The girls shut down emotionally when Walls asked them how they ended up
in foster care and would only say that they were left with a friend of Mother=s. 








Walls knew that Mother was lying when she said
that she had visited her girls every week that they had been in CPS custody
because there were two or three times when the girls were really depressed
because Mother did not come for the visit or call to cancel.  Beth was devastated when Mother did not
appear for visits.  And Becca said that
she considered Mother dead because she had not been there for her.[19]  The girls loved Mother and cared deeply about
her but knew that she did not have the capabilityCdue to
her mental health issues and past drug abuseCto be a
responsible parent for them.  As of the
time of trial, Walls testified that the girls were exhausted with
inconsistency:  no-shows for the visits
and no calls. 

Wall believed that the girls had trust issues and
said that children need stability because they need to know how to trust.  In this case, Beth was frustrated with Mother=s
behavior and wanted to give her another chance. 
Beth had difficulty accepting that Mother is incapable of taking care of
them.  Becca did not want to be abandoned
anymore and did not want to go back to Mother. 
The girls said that they were tired of moving around and that they
wanted to be in a stable environment.  








Walls testified that the girls had realized that
they were not going home.  They had
accepted that they were okay in the current foster placement and had expressed
that they really felt good about their foster home because someone was always
there when they needed something.  Wall
said that the foster home provided appropriate boundaries and stability for the
girls and had a point system for doing tasks. 

G.     Plans for the Future

1.     Mother

Mother=s plan
was to continue working on her sobriety by attending NA meetings and working
with her sponsor.  Mother also said that
she had a plan in place to stay away from family violence, but she did not elaborate
on what the plan was. 








Mother said that the girls would turn eighteen in
only a few years and that it would not be in their best interest to tear them
away from her because Mother was close to her daughters and had a good
relationship with them despite all the things that they had been through.  Mother felt Alike the
kids [had] been under a lot of stress, and, you know, told a lot of things and
so forth of their desires, and what they share[d] with [her] versus, you know,
what other people, you know, portray[ed] how they feel [are] two different
things.@  Mother testified that the girls wanted to
visit with her and that they wanted to come home with her.  Thus, Mother testified that she was in a
position to care for the girls,[20]
that she did not want her parental rights terminated, and that it was not in
the girls= best interest to terminate her
parental rights. 

2.     The Girls

Myrosh and White testified that the girls
initially wanted to go back to their foster home in New Jersey, but now that
they had built relationships and friendships in Texas, they wanted to stay with
their current foster family.  Myrosh
testified that the girls had voiced that they wanted to move forward, so their
plan was to stay in foster care, go through the PAL Program, and go to
college.  The girls, however, had always
told Mother that they wanted to come home and were excited about coming
home.  Myrosh also said that Beth did not
want to hurt Mother=s feelings because Beth cared
for her but that Beth did not want to live with Mother.  Myrosh believed that the girls were
reluctantly agreeing to stay in foster care because that was what they believed
that others wanted them to say. 








The girls told Walls and White that they wanted
stability but that they did not want to be adopted.  The girls told White that they wanted to have
some contact with Mother, and Beth told Walls that when she turns eighteen, she
wants to help Mother. 

3.     CASA

Myrosh did not believe that Mother had accepted
appropriate responsibility for the situation her girls were in, nor did she
think that if the girls were placed back with Mother that they would have a
safe and secure environment that would appropriately enhance their physical and
emotional needs.  Instead, Myrosh was
concerned for the girls= safety due to Mother=s pattern
of coming in and out of their lives and believed that continued contact with
Mother would put the girls in an emotional upheaval.  Myrosh therefore believed that Mother=s
parental rights should be terminated because when Mother is in the picture, the
girls are angry, and when she is not, they relax and start looking toward the
future. 

4.     Counselor








Walls believed that the girls should stay at
their current foster home because the home had been stable for them.  They loved their school, their foster
parents, and the environment.  They
realized that they would go to school, come home, and still be living in the
same place the next day, which is stability that they had not previously
enjoyed.  But because Beth told Walls
that she would be devastated if she could not have visits with Mother, Walls
suggested that the trial court allow Mother monthly visits if she could commit
to keeping them but noted that sporadic visits would be devastating to the
girls.  Walls said that so long as Mother
(1) demonstrated that she was able to visit with her daughters on a continual basis
or to call when she could not be there, (2) stayed drug-free, and (3) followed
her doctor=s recommendations for taking her
medications, Walls believed that Mother=s
parental rights should not be terminated. 
However, Walls testified that the girls needed closure and that
termination of Mother=s rights would be best if she
could not demonstrate consistency. 

5.     CPS

White believed that Beth and Becca needed
closure.  White did not have any concerns
about the foster home and believed that the foster parents loved the girls and
were willing to take care of their physical, emotional, mental, and spiritual
needs now and through adulthood.  White therefore
believed it would be in the girls= best
interest to keep them with their foster parents and to terminate the parental
rights of Mother. 

H.     Trial Court=s
Disposition








After hearing the above evidence and reviewing
Mother=s MHMR
records that were admitted into evidence, the trial court found that it was in
the best interest to terminate Mother=s parental
rights to her daughters.  The trial court
thereafter signed a judgment terminating Mother=s
parental rights after finding by clear and convincing evidence that Mother had
knowingly placed or knowingly allowed the children to remain in conditions or
surroundings which endangered the physical or emotional well-being of the
children and engaged in conduct or knowingly placed the children with persons
who engaged in conduct which endangered the physical or emotional well-being of
the children; that Mother has a mental or emotional illness or a mental
deficiency that renders her unable to provide for the physical, emotional, and
mental needs of the children and that the illness, in all reasonable
probability, would continue to render Mother unable to provide for the children=s needs
until their eighteenth birthdays; and that termination of the parent-child
relationship with Mother was in the children=s best
interest.  This appeal followed.

III. 
Burden of Proof and Standards of Review








A parent=s rights
to Athe
companionship, care, custody, and management@ of his
or her children are constitutional interests Afar more
precious than any property right.@  Santosky v. Kramer, 455 U.S. 745, 758B59, 102
S. Ct. 1388, 1397 (1982); In re M.S., 115 S.W.3d 534, 547 (Tex.
2003).  AWhile
parental rights are of constitutional magnitude, they are not absolute, and
just as it is imperative for courts to recognize the constitutional
underpinnings of the parent-child relationship, it is also essential that
emotional and physical interests of the child not be sacrificed merely to
preserve that right.@ 
In re C.H., 89 S.W.3d 17, 26 (Tex. 2002).  In a termination case, TDFPS seeks not just
to limit parental rights but to erase them permanentlyCto
divest the parent and child of all legal rights, privileges, duties, and powers
normally existing between them, except for the child=s right
to inherit.  Tex. Fam. Code Ann. '
161.206(b) (Vernon 2008); Holick v. Smith, 685 S.W.2d 18, 20 (Tex.
1985).  We strictly scrutinize
termination proceedings and strictly construe involuntary termination statutes
in favor of the parent.  Holick,
685 S.W.2d at 20B21; In re M.C.T., 250
S.W.3d 161, 167 (Tex. App.CFort
Worth 2008, no pet.).

In proceedings to terminate the parent‑child
relationship brought under section 161.001 of the family code, the petitioner
must establish one ground listed under subdivision (1) of the statute and must
also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. ' 161.001
(Vernon 2008); In re J.L., 163 S.W.3d 79, 84 (Tex. 2005).  Both elements must be established;
termination may not be based solely on the best interest of the child as
determined by the trier of fact.  Tex.
Dep=t of Human Servs. v. Boyd, 727
S.W.2d 531, 533 (Tex. 1987).








Termination decisions must be supported by clear
and convincing evidence.  Tex. Fam. Code
Ann. ''
161.001, 161.206(a).  Evidence is clear
and convincing if it Awill produce in the mind of the
trier of fact a firm belief or conviction as to the truth of the allegations
sought to be established.@  Id. ' 101.007
(Vernon 2008).  Due process demands this
heightened standard because termination results in permanent, irrevocable
changes for the parent and child.  In
re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002); see In re J.A.J.,
243 S.W.3d 611, 616 (Tex. 2007) (contrasting standards for termination and
modification).

In reviewing the evidence for legal sufficiency
in parental termination cases, we must determine whether the evidence is such
that a factfinder could reasonably form a firm belief or conviction that the
grounds for termination were proven.  In
re J.P.B., 180 S.W.3d 570, 573 (Tex. 2005). 
We must review all the evidence in the light most favorable to the
finding and judgment.  Id.  This means that we must assume that the
factfinder resolved any disputed facts in favor of its finding if a reasonable
factfinder could have done so.  Id.  We must also disregard all evidence that a
reasonable factfinder could have disbelieved. 
Id.  We must consider,
however, undisputed evidence even if it is contrary to the finding.  Id. 
That is, we must consider evidence favorable to termination if a
reasonable factfinder could, and disregard contrary evidence unless a
reasonable factfinder could not.  Id.








We must therefore consider all of the evidence,
not just that which favors the verdict. 
Id.  But we cannot weigh
witness credibility issues that depend on the appearance and demeanor of the
witnesses, for that is the factfinder=s
province.  Id. at 573B74.  And even when credibility issues appear in the
appellate record, we must defer to the factfinder=s
determinations as long as they are not unreasonable.  Id. at 573.

In reviewing the evidence for factual
sufficiency, we must give due deference to the factfinder=s
findings and not supplant the judgment with our own.  In re H.R.M., 209 S.W.3d 105, 108
(Tex. 2006).  We must determine whether,
on the entire record, a factfinder could reasonably form a firm conviction or
belief that the parent violated section 161.001(1)(D) or (E) and that the
termination of the parent-child relationship would be in the best interest of
the child.  C.H., 89 S.W.3d at
28.  If, in light of the entire record,
the disputed evidence that a reasonable factfinder could not have credited in
favor of the finding is so significant that a factfinder could not reasonably
have formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  H.R.M.,
209 S.W.3d at 108.

IV.  Conduct and Environmental Endangerment








In her first issue, Mother argues that the
evidence is legally and factually insufficient to establish the endangerment
termination grounds.  Specifically,
Mother argues that TDFPS failed to prove that Mother engaged in an endangering
course of conduct or that Mother allowed the children to live in an endangering
environment. 








Endangerment means to expose to loss or injury,
to jeopardize.  Boyd, 727 S.W.2d
at 533; In re J.T.G., 121 S.W.3d 117, 125 (Tex. App.CFort
Worth 2003, no pet.); see also In re M.C., 917 S.W.2d 268, 269 (Tex.
1996).  To prove endangerment under
subsection (D), TDFPS had to prove that Mother (1) knowingly (2) placed or allowed
her children to remain (3) in conditions or surroundings that endangered their
physical or emotional well‑being.  See
Tex. Fam. Code Ann. ' 161.001(1)(D).  Under section 161.001(1)(E), the relevant
inquiry is whether evidence exists that the endangerment of the children=s
physical well‑being was the direct result of Mother=s
conduct, including acts, omissions, or failures to act.  J.T.G., 121 S.W.3d at 125; see
Tex. Fam. Code Ann. ' 161.001(1)(E).  Additionally, termination under section
161.001(1)(E) must be based on more than a single act or omission; a voluntary,
deliberate, and conscious course of conduct by the parent is required.  J.T.G., 121 S.W.3d at 125; see
Tex. Fam. Code Ann. ' 161.001(1)(E).  However, it is not necessary that the parent=s
conduct be directed at the children or that the children actually suffer
injury.  Boyd, 727 S.W.2d at 533; J.T.G.,
121 S.W.3d at 125.  The specific danger
to the children=s well‑being may be
inferred from parental misconduct standing alone.  Boyd, 727 S.W.2d at 533; In re R.W.,
129 S.W.3d 732, 738 (Tex. App.CFort
Worth 2004, pet. denied).  To determine
whether termination is necessary, courts may look to parental conduct occurring
both before and after the children=s
birth.  In re D.M., 58 S.W.3d 801,
812 (Tex. App.CFort Worth 2001, no pet.).

Stability and permanence are paramount in the
upbringing of children.  See In re
T.D.C., 91 S.W.3d 865, 873 (Tex. App.CFort
Worth 2002, pet. denied).  A factfinder
may infer from past conduct endangering the well‑being of the children
that similar conduct will recur if the children are returned to the parent.  See In re D.L.N., 958 S.W.2d 934, 941
(Tex. App.CWaco 1997, pet. denied), disapproved
on other grounds by J.F.C., 96 S.W.3d at 256, and C.H.,
89 S.W.3d at 17.  Drug use and its effect
on a parent=s life and her ability to parent
may establish an endangering course of conduct. 
Dupree v. Tex. Dep=t of
Protective & Regulatory Servs., 907 S.W.2d 81, 84 (Tex. App.CDallas
1995, no writ).

The record contains substantial evidence of
subsection (D) environmental endangerment and subsection (E) course of conduct
endangerment to the physical or emotional well‑being of the
children.  Because the evidence concerning
these two statutory grounds for termination is interrelated, we consolidate our
examination of it.  See J.T.G.,
121 S.W.3d at 126.








The record demonstrates that Mother had a long
history of illegal drug use, dating back to when she was sixteen years old and
was offered cocaine.  Mother also had a
history of disappearing[21]
and of relying on others to parent her daughters while she was away.  Because of Mother=s
disappearances, the girls did not experience stability in their home
environment; the record revealed that the girls= foster
placement might be the longest that they had ever lived in one place.  The record also revealed that there were
domestic violence issues between Mother and H.G., which the girls witnessed,
and that Beth was fearful of the abuse that she had received from Mother and
her stepfather, which involved holding her down and hitting her. 

We have carefully reviewed the entire
record.  Giving due deference to the
trial court=s findings, we hold that a
reasonable trier of fact could have formed a firm belief or conviction that
Mother knowingly placed Beth and Becca in conditions and engaged in conduct that
endangered their physical or emotional well‑being.  See Tex. Fam. Code Ann. '
161.001(1)(D), (E); J.F.C., 96 S.W.3d at 265B66; C.H.,
89 S.W.3d at 25; J.T.G., 121 S.W.3d at 124.








Although Mother loved the children and had made some effort to comply
with her service plan, the record reflects her ability to refrain from drugs
was short-term and that when she was abusing drugs, dating, or both, she could
not provide a safe and stable environment for the children.  See In re J.C.J., No. 05-05-01555-CV,
2006 WL 2348987, at *7 (Tex. App.CDallas
Aug. 15, 2006, no pet.) (mem. op.) (holding that evidence was legally and
factually sufficient to show that father engaged in conduct that endangered his
children=s
well-being by not staying off drugs, by not staying on his medications, and by
not providing a safe and stable environment for the children); see also In
re M.R., 243 S.W.3d 807, 819 (Tex. App.CFort
Worth 2007, no pet.) (holding that record contained legally and factually
sufficient evidence of both endangerment grounds when, among other things, it
showed that mother exposed children to domestic violence and refused to
participate in her CPS service plan). 
Accordingly, we hold that the evidence is legally and factually
sufficient to support the trial court=s
findings on environmental endangerment and course of conduct endangerment.  We overrule Mother=s first
issue.[22]








V.  Termination of Mother=s
Parental Rights Was

In
The Children=s Best Interest

 

In her fourth issue, Mother challenges the legal
and factual sufficiency of the evidence to support the finding that the
termination of her parental rights to Beth and Becca was in their best
interest. 

A.     Standard of Review for Best Interest

There is a strong presumption that keeping a
child with a parent is in the child=s best
interest.  In re R.R., 209 S.W.3d
112, 116 (Tex. 2006).  Prompt and
permanent placement of the child in a safe environment is also presumed to be
in the child=s best interest.  Tex. Fam. Code Ann. ' 263.307(a)
(Vernon 2008).  The following factors
should be considered in evaluating the parent=s
willingness and ability to provide the child with a safe environment:

(1) the child=s age and physical and
mental vulnerabilities;

 

(2) the frequency and nature of out‑of‑home placements;

 

(3) the magnitude,
frequency, and circumstances of the harm to the child;

 

(4) whether the child has
been the victim of repeated harm after the initial report and intervention by
the department or other agency;

 








(5) whether the child is
fearful of living in or returning to the child=s home;

 

(6) the results of
psychiatric, psychological, or developmental evaluations of the child, the
child=s parents, other family
members, or others who have access to the child=s home;

 

(7) whether there is a
history of abusive or assaultive conduct by the child=s family or others who
have access to the child=s home;

 

(8) whether there is a
history of substance abuse by the child=s family or others who have access to the child=s home;

 

(9) whether the
perpetrator of the harm to the child is identified;

 

(10) the willingness and
ability of the child=s family to seek out,
accept, and complete counseling services and to cooperate with and facilitate
an appropriate agency=s close supervision;

 

(11) the willingness and
ability of the child=s family to effect
positive environmental and personal changes within a reasonable period of time;

 

(12) whether the child=s family demonstrates adequate
parenting skills, including providing the child and other children under the
family=s care with:

 

(A) minimally adequate health and nutritional care;

 

(B) care, nurturance, and
appropriate discipline consistent with the child=s physical and
psychological development;

 

(C) guidance and
supervision consistent with the child=s safety;

 








(D) a safe physical home environment;

 

(E) protection from
repeated exposure to violence even though the violence may not be directed at
the child;  and

 

(F) an understanding of
the child=s needs and capabilities;
and

 

(13) whether an adequate social support system
consisting of an extended family and friends is available to the child.

Id. ' 263.307(b); R.R.,
209 S.W.3d at 116.

Other, nonexclusive factors that the trier of
fact in a termination case may use in determining the best interest of the
child include (1) the desires of the child, (2) the emotional and physical
needs of the child now and in the future, (3) the emotional and physical danger
to the child now and in the future; (4) the parental abilities of the
individuals seeking custody, (5) the programs available to assist these
individuals to promote the best interest of the child, (6) the plans for the
child by these individuals or by the agency seeking custody, (7) the stability
of the home or proposed placement, (8) the acts or omissions of the parent
which may indicate that the existing parent‑child relationship is not a
proper one, and (9) any excuse for the acts or omissions of the parent.  Holley v. Adams, 544 S.W.2d 367, 371B72 (Tex.
1976).








These factors are not exhaustive; some listed
factors may be inapplicable to some cases; other factors not on the list may
also be considered when appropriate.  C.H.,
89 S.W.3d at 27.  Furthermore, undisputed
evidence of just one factor may be sufficient in a particular case to support a
finding that termination is in the best interest of the child.  Id. 
On the other hand, the presence of scant evidence relevant to each
factor will not support such a finding.  Id.

B.     Best Interest Analysis

Because Mother claims that no legally and
factually sufficient evidence exists to establish that termination of her
parental rights is in the children=s best
interest, we begin our analysis with the factors listed in family code section
263.307(b).

With regard to the first statutory factor, the
children involved were thirteen and fourteen at the time of trial.  Beth had been diagnosed with bipolar
disorder, and Becca had been diagnosed with ADHD and required medication to
stabilize her mood.[23]








Under the second factor, the record revealed that
CPS was able to place Beth and Becca in the same foster home; the girls were
never moved to another foster home or returned to Mother after they were
removed from her in Texas.  The record
contains evidence that the girls had previously lived in a foster home in New
Jersey but were returned to Mother after she completed her New Jersey service
plan.

With regard to the third, fourth, and ninth
factors, the girls were exposed to domestic violence incidents involving Mother
and the girls= stepfather, H.G.  The girls were also harmed by Mother=s numerous
disappearances, both before and after the removal.  The record also revealed that the girls had
been exposed to Mother=s drug paraphernalia.

With regard to the fifth factor, the record
revealed that Beth was fearful of the abuse that she had received from Mother
and H.G., which involved holding her down and hitting her, and that both girls
were afraid of Mother=s Agoing in
and out [of their lives] constantly.@

With regard to the sixth factor, the record did
not include psychiatric, psychological, or developmental evaluations of the
children; however as mentioned above, several people testified that Beth was on
medication for bipolar disorder and that Becca was on medication for ADHD and
mood stabilization.  The record also
demonstrated that Mother had been diagnosed with bipolar disorder and that she
had a history of Aparanoid ideation.@








The record was replete with evidence of the
seventh and eighth factors.  As set forth
above, domestic violence was present when H.G. was in the home.  Additionally, the record revealed that Mother
had used cocaine, alcohol, and marijuana and that her most recent cocaine use
was during the same year as the trial. 

With regard to the tenth and eleventh factors,
Mother did not successfully complete the individual counseling that was required
by her service plan.  White believed that
Mother had ample opportunity to work the service plan but that Mother had not
made any significant changes in her life to regain custody of her daughters.








The twelfth factorCwhether
the child=s family demonstrates adequate
parenting skillsCis hard to quantify because
Mother appeared to relegate the parenting of her daughters to neighbors so that
she could disappear.  Moreover, when
Hawkins called the girls= father, he stated that he could
not believe that New Jersey CPS Awould
give a crackhead back her kids@ and
that Mother Ais going to get them kids
killed.@[24]  Additionally, with regard to Mother=s
ability to provide the girls with a safe home environment, Mother had filed for
divorce from H.G.  However, Mother=s
housing situation had been in flux throughout the case, and she admitted that
it would be affected again if her disability income was not approved.  And though Mother said that one thing she
learned from her parenting class is how to address her teenage daughters and
respond to them as they go through adolescence, the record revealed that Mother
had what CPS deemed to be  inappropriate
discussions with her daughters regarding the case.

Mother testified regarding the final statutory
factor that she did not have family members available to take her
daughters.  White testified that Mother
did not have an adequate social support system to help her with her daughters,
and Mother=s MHMR records revealed that her
support system included Afew friends.@

Regarding the first Holley factor, the
girls did not testify at trial, but they had expressed their desires to several
people who testified at trial.  The
record revealed that the girls did not want to disappoint Mother and told her
that they wanted to live with her, but the girls told others that they wanted
to stay with their current foster family in order to have stability. 








Regarding the second factorCthe
children=s
present and future physical and emotional needsCBeth
needed to continue taking medication for bipolar disorder, and Becca needed to
continue taking medication for ADHD and mood stabilization.  Additionally, both girls spoke of wanting
stability, and the record reflected that the girls had not lived in a stable
home other than their foster home.  The
record also demonstrated the girls= need
for consistency as Mother=s inconsistent visiting pattern
sent the girls on an emotional roller coaster, affecting all areas of their
lives.

The third and eighth factorsCthe
emotional and physical danger to the children now and in the future and the
acts or omissions of the parent which may indicate that the existing
parent-child relationship is not a proper oneCwere at
the heart of this case.  Myrosh testified
that continued contact with Mother would put the girls in an emotional upheaval
and that she (Myrosh) was concerned for the girls= safety
due to Mother=s pattern of coming in and out
of their lives.  Beth told Myrosh that
she would rather not go back to Mother because she is fearful of the abuse she
experienced from Mother and H.G. and is fearful of being left again. 

Regarding the fourth factorCthe
parental abilities of the individuals seeking custodyCMyrosh
testified that the current foster placement provides the girls with a safe and
secure environment that appropriately enhances their physical and emotional
needs.  The record revealed that the
foster parents have worked with the girls on their behavior; have provided the
girls with appropriate boundaries and stability, sufficient food, and proper
clothing; and have taken the girls to counseling during the time that they have
housed them. 








Concerning the fifth factor, Mother attempted to
better herself by attending parenting classes, anger management classes, and NA
and by completing her psychological evaluation and drug assessment.  However, she failed to consistently visit
with the children; to complete her individual counseling sessions; to submit a
hair follicle for drug testing; and to establish stable housing, stable
employment, and emotional stability.

Regarding the parties= plans
for the childrenCthe sixth factorCMother
testified that she was in a position to care for the girls and that it was not
in their best interest to tear them away from her.  Myrosh believed that Mother=s
parental rights should be terminated so that the girls could relax and start
looking toward the future, and White agreed, stating that it is in the girls= best
interest to keep them with their foster parents.

Regarding the stability of the proposed placementCthe
seventh factorCthe evidence demonstrated that
terminating Mother=s parental rights would allow
the girls to remain in their current foster placementCthe
place where they have lived the longestCwhich
would allow them to have the stability that was lacking when they lived with
Mother.








Finally, concerning the ninth factorCany
excuse for the parents= acts or omissionsCMother
said that she was accountable for the poor decisions that she had made in her
life and for how her decisions had affected her children.  Although Mother said that she did not appear
for any visits during all of May and most of June because she was in a shelter
and did not have the resources to travel to the visits, she agreed that it is
neglectful for a parent to disappear for a few months and not let the child
know where he or she is.  Mother admitted
that her daughters witnessed domestic violence when they lived with her and
that she did not believe it was appropriate for them to witness that.  Mother also admitted that Beth and Becca
witnessed Mother=s drug use and found a crack
pipe in the house in New Jersey.  Mother
said that she had been diagnosed with bipolar disorder and that for the
majority of her life, she had depended on the government for assistance.  Mother agreed that she had not shown a lot of
stability throughout the case but said that was due to her lack of income;
however, Mother would not agree that she had a history of abandoning her daughters.

In sum, the record demonstrates that CPS agencies
from two statesCNew Jersey and TexasChad
extensive involvement with Mother. 
Mother=s history of drug use and
disappearances, difficulty maintaining stable housing, and inappropriate choice
for a spouse, which put her children in danger by exposing them to domestic
violence, all demonstrate that it was in the children=s best
interest that Mother=s parental rights be
terminated.  See Tex. Fam. Code
Ann. ' 161.001(2).








Giving due consideration to evidence that the
factfinder could have reasonably found to be clear and convincing, and based on
our review of the entire record, we hold that a reasonable trier of fact could
have formed a firm belief or conviction that the termination of Mother=s
parental rights would be in the children=s best
interest.  See In re K.A.S., 131
S.W.3d 215, 226B30 (Tex. App.CFort
Worth 2004, pet. denied) (holding that evidence was legally and factually
sufficient to support best-interest finding because there was domestic violence
in home, child had attempted suicide, mother had lengthy history of noncompliance
in taking medications for her bipolar disorder and had rages and struck
children when noncompliant, oldest child=s
bipolar disorder and post‑traumatic stress disorder would contribute to
problems in home, and children were secure in their temporary placements in
foster care); In re M.B., No. 02-07-00280-CV, 2008 WL 2930530, at *14
(Tex. App.CFort Worth July 31, 2008, no
pet.) (mem. op.) (holding that evidence was factually sufficient to support
jury=s
finding that termination of appellant=s
parental rights was in children=s best
interest because TDFPS had received eight to ten referrals about appellant,
appellant had difficulty maintaining safe and stable housing, appellant had an
inconsistent employment history with no guaranteed income, and appellant made
inappropriate choices by living with a sex offender and engaging in domestic
violence).  Accordingly, we hold that the
evidence is legally and factually sufficient to support the trial court=s
best-interest finding.  We overrule
Mother=s fourth
issue.








VI.  Conclusion

Having overruled Mother=s
dispositive first and fourth issues, we affirm the trial court=s
judgment terminating her parental rights to Beth and Becca.

 

SUE
WALKER

JUSTICE

 

PANEL: DAUPHINOT,
GARDNER, and WALKER, JJ.

 

DELIVERED: May 7, 2009











[1]See Tex. R. App. P. 47.4.





[2]Pursuant to Texas Rule of
Appellate Procedure 9.8(b)(2), we use aliases for the names of the children.





[3]Although Mother lists six
issues under her AIssues Presented@ section, only four of
those issues are briefed.





[4]Lazane Wall, who saw Beth
and Becca for counseling, said that she was concerned about how secretive
Mother was when asked questions at trial about her older children.  Wall said that Mother did not seem like
someone who wanted her children back.





[5]Prior to November 2006,
none of the referrals were substantiated, so the children were not removed from
Mother.





[6]Mother did not recall
that at one point in New Jersey, H.G. had thrown a glass container at her and
missed, hitting one of her daughters and cutting her.  Mother also did not recall Becca ever telling
her that she was fearful that H.G. would kill Mother.





[7]Mother testified that
Beth was diagnosed as bipolar when she was thirteen and that she takes
Seroquel.





[8]Hawkins called the phone
number on Beth=s bottle of medication,
and the pharmacist provided the phone number for Beth=s doctor.  They left a message for the doctor, but
Hawkins does not know what happened after that.





[9]White testified that from
the time the girls were removed in late November 2007 until the time White
received the case in late January 2008, Mother did not communicate with anyone
at CPS or with her daughters.





[10]Mother told White that
she was working at Motorola early in the case, and so CPS scheduled visits
around Mother=s work schedule.  It was a surprise to White when she heard
Mother testify at trial that she had worked only one day during the case.





[11]Mother recalled sitting
in Dr. Matthews=s office, but she did not
recall telling him that she had been hospitalized four or five times for
psychiatric treatment, that she had been hearing and seeing things, that she
had been arrested before, that she believed that there were cameras in her
house, or that she believed that people were following her.





[12]CPS considers test results
to be positive if a parent does not take a requested drug test.





[13]The trial took place on
September 9 and 12 and October 2, 2008.





[14]Susan Myrosh, the CASA
advocate for the girls, testified that Mother had lived five places during this
case:  an Arlington shelter, a Fort Worth
shelter, a house on Liberty Street, an Arlington shelter, and her current
address. 





[15]Mother testified that
H.G. came back and lived with her in an apartment in Texas in February 2008. 





[16]Despite having contact
information, neither White nor Myrosh found Mother to be very forthcoming with
information during the course of the case.





[17]During this time, visits
were not taking place.





[18]When the girls were in
foster care in New Jersey, Mother was gone for the whole summer.  The girls said that this is the way it had
always been; once their mother got Aa guy in her life,@ then she was out of the
picture for a couple of months.





[19]The girls said that
Mother had a boyfriend and that whenever she dated, they Abecame somewhat
abandoned.@





[20]Beth told White that
Becca had told her that Mother wanted Becca to Abe okay@ with H.G. living in the
home so that the girls could come home to her and H.G.





[21]In addition to the
evidence set forth above, the trial court took judicial notice that a status
review was held on February 6, 2008, and that a permanency review was held on
June 25, 2008, and that Mother had been gone two months prior to those two
hearings.





[22]Texas law provides that
parental rights may properly be terminated when a trial court has made a
finding under either section 161.001(1) or section 161.003, plus a best
interest finding under section 161.001(2). 
See In re W.E.C., 110 S.W.3d 231, 240 (Tex. App.CFort Worth 2003, no
pet.).  Because we have held that
termination was proper under section 161.001(1)(D) and (E), we need not address
Mother=s second and third issues
in which she challenges the trial court=s termination of her parental rights based on
grounds listed under section 161.003.  See
Tex. R. App. P. 47.1.





[23]Becca was diagnosed with
ADHD while in CPS care.





[24]The girls= father said that there
had been a drive-by shooting at one of the homes that Mother had lived in and
that the girls had been there at the time of the shooting.